IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
On-Brief January 6, 2005

## SHAWN RUNIONS v. BILL EMERSON, ET AL.

**A Direct Appeal from the Chancery Court for Crockett County**
**No. 8398     The Honorable George R. Ellis, Chancellor**

---

**No. W2004-01618-COA-R3-CV - Filed February 14, 2005**

---

Tenured elementary school teacher appeals her termination for alleged incompetence, inefficiency, insubordination, neglect of duty, and compromising the integrity of the Tennessee Comprehensive Assessment Program (TCAP) test. The Chancery Court reversed the termination, finding that the school board's decision to terminate teacher was arbitrary and capricious and based on no material evidence. Concluding that the Chancery Court did not err in reversing the termination, we affirm the judgment of the chancery court.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Charles W. Cagle of Nashville for Appellant, Bells City Schools

Marcella G. Fletcher of Jackson for Appellee, Shawn Runions

### OPINION

In April 2003, second-grade teacher Shawn Runions was suspended with pay from her position in the Bells, Tennessee public school system for allegedly violating the "security agreement" she signed concerning procedures for administering the Tennessee Comprehensive Assessment Program (TCAP) test to her second grade class. The alleged violation was the provision of "unauthorized assistance to students in her class." After hearings held in June 2003 by the Bells City Board of Education, she was terminated from her position. On appeal, the Chancery Court of Crockett County reversed Ms. Runions' termination, and we affirm the judgment of the chancery court.

### I. PROCEDURAL HISTORY

On April 3, 2003, Appellee Shawn Runions was suspended with pay from her position as a tenured teacher in the Bells City School System. On May 15, 2003, charges for Ms. Runions' dismissal as a tenured teacher were presented to the Bells City Board of Education. Ms. Runions requested a hearing on these charges before the Board of Education. The Board of Education held hearings on June 27 and June 30, 2003, to determine whether Ms. Runions should be terminated from her position. After the June 27 and June 30, 2003 hearings, Ms. Runions was terminated from her position. Ms. Runions timely appealed to the Chancery Court of Crockett County. The case came before the chancery court on February 17, 2004. On May 25, 2005, the chancery court entered an order reversing the school board's decision terminating Ms. Runions.

## II. FACTS

Shawn Runions graduated from Union University in Jackson, Tennessee with a 3.87 grade-point average. After graduation, she obtained a Tennessee teaching license and taught for five years at Friendship Elementary in the Crockett County School System. After giving birth to her daughter, Ms. Runions stayed at home for some time. She resumed her teaching career in 1997 when she accepted a position with the Bells Elementary School, where she taught until the time of her dismissal.

There is no suggestion in the record that Ms. Runions' performance as a teacher at Bells City School was unacceptable in any way. Her performance evaluations, which were admitted into evidence, were uniformly positive. Her principal acknowledged at the termination hearing that her evaluation scores were "good." The narrative evaluations of Ms. Runions' teaching were also laudatory: "Shawn demonstrated an understanding of concepts and structures of the disciplines taught and provided student access to this information through classroom experiences which made the subject matter understandable and meaningful" (from an evaluation dated May 13, 1999); "Good classroom management skills" (from an evaluation dated May 20, 2000); "Shawn used her understanding of both the students and the subject matter of her math curriculum to create a learning environment that encouraged active engagement in learning, positive intellectual interactions and student ownership of learning" (from an evaluation dated March 22, 2000).

At the time of the events leading to her dismissal, the principal of Bells Elementary School was Charles Millard Williams, III, who is also Ms. Runions' uncle. The record contains evidence that Principal Williams was a regular member of a coffee klatch that included Ms. Runions' father and that Principal Williams took considerable interest in certain family matters involving Ms. Runions, her husband, and her father. Although the board members and witnesses at the termination hearing carefully avoided discussing the nature of these family matters, the transcript shows that these matters were alluded to several times during the hearing. Ms. Runions testified that Principal Williams's frequent, browbeating attempts to discuss these matters on school time was a distraction from her teaching duties, and she ultimately had to ask Principal Williams not to bring up her personal life at work: "[F]inally, I told him ... if it's something about my teaching, that's fine, but ... I don't want to discuss my personal life with you up here at 8:00 in the morning and it affect[s] my teaching."

The administration of the TCAP test that gave rise to Ms. Runions' suspension and subsequent dismissal was held on Thursday, April 3, 2003. She testified that she was absent from work on the Tuesday and Wednesday just prior to the test due to an ear infection and a burst eardrum. Prior to the administration of the test, teachers were required to sign a typewritten Test Security Policy dealing with the handling of test materials, affirming that they would follow "each and every rule stated." However, Ms. Runions, due to her absence on the two days prior to the test administration, did not have the opportunity to sign this agreement prior to the test. The form was to be signed and dated by both the Testing Coordinator and the teacher. It was uncontested that, at the behest of school officials, she signed the test security policy only *after* the incidents that led to her dismissal.

In light of Ms. Runions' illness, the school assigned Charlotte White, a licensed teacher[1], to be a proctor in her classroom, so that the TCAP test could proceed if Ms. Runions were forced to be absent on the day of the test due to her ear infection and burst eardrum.[2] However, Ms. Runions did go to school on the day of the test; she arrived at school at 7:45 a.m. and led her students from the gym to her classroom. Once in the classroom, Ms. Runions served donuts and orange juice to the students and Ms. White.[3] Ms. Runions then began to administer the test.

Because the basis for Ms. Runions' dismissal is several breaches of test security that allegedly occurred during the administration of the test, we will review the testimony concerning these alleged breaches in detail. Most of the alleged breaches were witnessed solely by her proctor, Charlotte White, who summed up Ms. Runions' objectionable behavior by saying, "Ms. Shawn was giving clues and coaching."

The first breach of test security alleged by Ms. White had to do with the measurement of a picture of an alligator in the test booklet for the Reading Sub-Test Part I. A small, paper ruler—one side marked with inches and the other side marked with centimeters—was provided to the children with their test booklets, and they were expected to measure the alligator using the ruler. Ms. White testified that Ms. Runions directed the students, "Turn the ruler to the yellow side and measure from the tip of his nose to the tip of his tail." Ms. Runions denied that she had directed the second-graders which side to use, but testified that she had said only, "Make sure that you use the right side of the ruler ... Make sure that you use the proper—read your question correctly and make sure you answer—if it talks about centimeters, use the centimeter side. If it talks about inches, use the inch side."

---

[1]      Although she had held a Tennessee teacher's license for 21 years by the time of Ms. Runions' termination hearing, Ms. White did not actually hold a full-time teaching position at the school, but held the position of "Federal Projects Director." She also taught Microsoft Excel.

[2]      According to testimony at the termination hearing, the TCAP test can only be administered by a licensed teacher.

[3]      Ms. Runions testified that she bought and served these refreshments because Ms. White had made it clear that breakfast was a perquisite she had come to expect when proctoring tests for other teachers.

Another security breach alleged by Ms. White was that Ms. Runions told a student, "You had that one right the first time." Ms. Runions denied this allegation as well, stating that she only made a general statement to the whole class, to the effect that "'When I was a student I can remember one of my teachers telling me that your first choice is your best choice.'.... I did not actually do it individually. I talked to the whole class .... I've done it every year."

Yet another security breach alleged by Ms. White was that Ms. Runions attempted to make a question comprehensible to her students by comparing the people described in a test question to "the Stupids," a family featured in a series of popular children's books, who do ordinary things in preposterous ways. Ms. Runions testified that she thought the comparison to the Stupids would help the second grade students understand the question better, saying, "I did not tell any answers to the question. I just made the statement."

After witnessing these alleged breaches of the test security policy, Ms. White abruptly left the classroom and sought out Lydia Crossnoe, a vice principal who served as the testing coordinator for the school. According to Ms. Crossnoe's testimony, Ms. White approached her and said, "I will not go back in there. You cannot make me go back in there. I have plenty of sick days. I'll take my days. I will go home. She's not giving that test right. I can't stay another minute. I won't stay another minute."[4] Ms. Crossnoe, faced with Ms. White's refusal to return to the classroom, tried to console Ms. White and then went to Ms. Runions' classroom herself. Once there, Ms. Crossnoe was asked by a bewildered Ms. Runions to find Charlotte White. Ms. Crossnoe explained that Charlotte White was "sick" and would not be returning, and that Ms. Crossnoe would proctor the test in the absence of Ms. White. Ms. Crossnoe noticed only one possible irregularity in Ms. Runions' administration of the test; while reading one of the questions Ms. Runions allegedly said "Mark the one that shows the states," which, Ms. Crossnoe testified, "just didn't sound exactly right." Later, she checked the test booklet and found that the question only said, "Mark the one that shows the continent."

After the students had finished taking the test, Ms. Crossnoe found Ms. White and said, "We have got to talk to Mr. Williams. We've got to tell him what happened." They related their observations to Mr. Williams, and Mr. Williams in turn related their story to Bill Emerson, the Superintendent of the Bells City School. Mr. Emerson then filled out a Breach of Security Report. Mr. Williams then made a handwritten addition to the Test Security Policy stating, "Only Read

---

[4] It was conceded by school officials that Ms. White's abandonment of her post as a proctor was, in itself, a violation of TCAP testing protocol, and yet, unlike Ms. Runions, she was not terminated. At the termination hearing, Marcella Fletcher, Ms. Runions' attorney, took care to bring this apparent disparity of treatment to light. Accounts of why Ms. White left the classroom are not altogether in accord. When testifying against Ms. Runions at the termination hearing, Ms. White claimed that she left Ms. Runions' classroom and was unable to return because she was "sick." Asked why she had been sick, Ms. White testified, "Because I didn't know what to do[,] because I was uncomfortable." However, Ms. Crossnoe's account of Ms. White's conduct suggests that Ms. White's demeanor would be more accurately described as a mixture of defiance, physical illness, and psychic distress. Ms. Crossnoe testified that Ms. White had been so upset by what she had seen Ms. Runions do that it was necessary for Ms. Crossnoe "to console her and calm her down and tell her it would be all right.... She wasn't going back in there whatever I said."

Instructions in Book – Do not add or give clues. Do not tell students if answer is right or wrong." He then asked every teacher except for Ms. Runions to sign this amended security policy. Mr. Emerson and Mr. Williams met with Ms. Runions and informed her that she would be suspended with pay until the end of the testing session. On April 10, Mr. Williams met with Ms. Runions again and informed her that she would be suspended for the remainder of the school year with pay. According to Ms. Runions' testimony, Mr. Williams urged her to resign for medical reasons, promising that if she were to do so, "we won't turn this into the State ... then I'll give you a good recommendation and we'll also pay you."

Ms. Runions refused to resign. Bill Emerson presented charges for her dismissal to the Bells City Board of Education on May 15, 2003. Ms. Runions requested a hearing on the charges before the Board of Education. A hearing was held on June 27 and June 30, 2003. At the conclusion of the hearing, the successful motion to dismiss Ms. Runions was made by the Chairman of the School Board, Gary Emison. The transcript of the hearing shows that in making this motion, Chairman Emison explained the necessity for terminating Ms. Runions' employment as follows:

> I think, myself, personally speaking, that because of the evidence presented and seeing that there probably is and possibly even may be in the future a lot of hard feelings between Ms. Runions and our school administrators, that I feel that Ms. Runions' tenure as a teacher at Bells Elementary has come to an end.

The Board of Education dismissed Ms. Runions on July 2, 2003.

### III. ISSUES

Ms. Runions presents the following issues for review:

I. Whether Ms. Runions violated Tennessee Code Annotated Section 49-1-607 by assisting students during the administration of the Tennessee Comprehensive Assessment Program.

II. Whether the weight of the evidence preponderates against the Chancery Court's determination that the Appellant arbitrarily and capriciously dismissed Ms. Runions pursuant to the Tennessee Tenured Teacher Act, Tenn. Code Ann. § 49-5-501.

### IV. STANDARD OF REVIEW

T.C.A. § 49-5-513 (2002) provides in pertinent part:

49-5-513. Judicial review.

(a) A teacher under "permanent tenure" or "limited tenure" status who is dismissed or suspended by action of the board may petition for

a writ of certiorari from the chancery court of the county where the teacher is employed.

* * *

(g) The cause shall stand for trial and shall be heard and determined at the earliest practical date, as one having precedence over other litigation, except suits involving state, county or municipal revenue. The review of the court shall be limited to the written record of the hearing before the board and any evidence or exhibits submitted at such hearing. Additional evidence or testimony shall not be admitted except as to establish arbitrary or capricious action or violation of statutory or constitutional rights by the board.

(h) The chancellor shall reduce the chancellor's findings of fact and conclusions of law to writing and make them parts of the record.

(i) Any party dissatisfied with the decree of the court may appeal as provided by the Tennessee Rules of Appellate Procedure, where the cause shall be heard on the transcript of the record from the chancery court.

This Court, in *Winkler v. Tipton County Bd. of Educ.*, 63 S.W.3d 376, 381 (Tenn.Ct.App. 2001), noted the appropriate standard of review for cases brought under the Teacher Tenure Act:

Judicial review of a teacher dismissal case pursuant to T.C.A. § 49-5-513 requires the chancery court to review the transcript of the hearing before the board in order to determine whether there was any material evidence to support the board's decision. If there is, it is the responsibility of the trial court to affirm. On the question of whether the Board acted arbitrarily, capriciously or illegally, the trial court may hear new evidence and must make independent findings in this regard. Our scope of review on appeal from chancery court is no greater than that court's review of the Board decision. *See Goodwin v. Metropolitan Board of Health*, 656 S.W.2d 383, 387 (Tenn.Ct.App.1983).

*Id.* (quoting *Wallace v. Mitchell*, No. W1999-01487-COA-R3-CV, 2000 Tenn.App. LEXIS 558, at *6-7 (Tenn.Ct.App.Aug.16, 2000) (emphasis added).

## V. ANALYSIS

A.    **Whether Ms. Runions violated Tennessee Code Annotated Section 49-1-607 by assisting students during the administration of the Tennessee Comprehensive Assessment Program.**

In dismissing Ms. Runions, Appellant relied in part upon Tennessee Code Annotated § 49-1-607, the statute governing compliance with TCAP security guidelines. The statute reads in its entirety as follows:

**49-1-607. Noncompliance with security guidelines for TCAP or successor test.**---Any person found to have not followed security guidelines for administration of the TCAP test, or a successor test, including making or distributing unauthorized copies of the test, altering a grade or answer sheet, providing copies of answers or test questions, or otherwise compromising the integrity of the testing process shall be placed on immediate suspension, and such actions will be grounds for dismissal, including dismissal of tenured employees. Such actions shall be grounds for revocation of state license.

With respect to the language of T.C.A. 49-1-607, Ms. Runions was not accused of "making or distributing unauthorized copies of the test," "altering a grade or answer sheet" or "providing copies of answers or test questions." It was asserted that because she failed to follow the security guidelines for administration of the TCAP test, Ms. Runions "compromised the integrity of the testing process." In order to determine whether the Chancery Court erred in concluding that there was no material evidence to support the charges against Ms. Runions, we must review the school's Test Security Policy.

The Test Security Policy was a typewritten document that, as noted in Section II of this Opinion *supra*, teachers were required to sign prior to administering the TCAP (but that, as we also noted *supra*, Ms. Runions did not have the opportunity to sign prior to the test, due to her absence on the two days prior to the test with an ear infection and burst eardrum). The Test Security Policy was entered into evidence at her termination hearing. The Test Security Policy reads, in its entirety, as follows:

**Bells Elementary School**
**Test Security Policy**

Testing Coordinator verifies the quantities of all test materials received at both the system and school level, which is one and the same. All test materials are also verified again before they are returned for processing.

The testing coordinator completes the student-identifying information on all consumable booklets and answer sheets in a secure setting. To ensure test confidentiality and proper processing, be sure that the student's name is listed correctly both on the demographics and on the back of the test booklet on grades K-3.

Each classroom is supplied with a neutral party adult to proctor during the test administration. Each proctor is trained to follow standard testing procedures and time limits.

Test Directions for Teachers remain in a secure setting in the building at all times. The K-3 Test Directions for Teachers contain secure item information; therefore, these directions are not handed out to educators until the day of the test.

When test booklets are not in use, they are stored in a locked room that is inaccessible to unauthorized persons. During the test, if restroom breaks occur during the testing session--collect all test materials, place in a central area, and **LOCK** your classroom door while **everyone** is out of the room.

Test booklets and materials are not to be handled by anyone who has not been authorized by the testing coordinator or building principal.

Verify the quantities of all materials before and after each daily test session. This is done in the office when **YOU**, the teacher, picks up and returns all materials.

**DO NOT** photocopy or duplicate any portion of the test booklets. (This includes rearranging or paraphrasing items.)

Make certain that the classroom in which the test is administered is free of reference materials, such as maps, instructional posters, or bulletin board materials that contain information likely to aid students on the test.

Document any test security breaches on the Breach of Testing Security Report form.

I verify that I will abide by all of the above rules and regulations pertaining to the security of the Achievement Test.

We note that this Test Security Policy deals almost exclusively with the proper procedures for physically securing, handling, and accounting for all TCAP test materials. Only one sentence of this agreement can be interpreted as having anything to do with a teacher's verbal instructions to her class; that is the sentence stating, "DO NOT photocopy or duplicate any portion of the test booklets. (This includes rearranging or paraphrasing items.)" However, there is no allegation that Ms. Runions rearranged or paraphrased any items on the test. We must conclude that two of the accusations—Ms. White's claims concerning Ms. Runions' instructions about the use of the ruler and concerning Ms. Runions' reference to The Stupids—did not constitute a violation of the Test Security Policy, for the reason that no provision in the policy proscribes such statements, and they do not on their face seem to be anything other than helpful, appropriate suggestions to Ms. Runions' second-grade students. (Furthermore, as we explain *infra*, we do not believe Ms. White to be a credible witness.) The third allegation by Ms. White, concerning Ms. Runions' alleged statement to a student that "You had that

one right the first time," would, if true, arguably show that Ms. Runions compromised the integrity of the test (although, strictly speaking, such an action is not explicitly proscribed by any provision of the Test Security Policy). However, we conclude there is no merit to this third allegation because we find that Ms. White is not a credible witness. Having considered Ms. White's implausible explanations for her own breach of TCAP testing procedure, along with Ms. Crossnoe's testimony about Ms. White's frenetic and excitable behavior at the time these violations were alleged to have occurred, we conclude that Ms. White was not an objective, reliable witness, and that her testimony must be discredited.[5] To base the termination of highly praised, tenured schoolteacher on the implausible accusations of a discredited witness such as Ms. White would, upon our review of the record, constitute manifest error. Therefore, we conclude, as did the chancery court, that there is no material evidence to support the allegation that Ms. Runions violated the security policy.[6]

**B.      Whether the weight of the evidence preponderates against the Chancery Court's determination that the Appellant arbitrarily and capriciously dismissed Ms. Runions pursuant to the Tennessee Tenured Teacher Act, Tenn. Code Ann. § 49-5-501.**

Under the Tennessee Teachers' Tenure Act, § 49-5-501 *et seq.*, there are five permissible grounds for dismissal of a tenured teacher. The statute states, in relevant part:

(1) No teacher shall be dismissed or suspended except as provided in this part.
(2) The causes for which a teacher may be dismissed are as follows: incompetence, inefficiency, neglect of duty, unprofessional conduct and insubordination as defined in § 49-5-501.

T.C.A. § 49-5-511(a). In dismissing Ms. Runions, the Bells City Board of Education cited four of the five permissible causes for dismissal enumerated in the Tennesee Teachers' Tenure Act: incompetence, inefficiency, insubordination, and neglect of duty. Upon Ms. Runions' appeal, the chancery court based its conclusion that the dismissal was arbitrary and capricious on its review of the transcript of the school board hearing and heard no additional evidence. In order to determine whether the school board acted arbitrarily and capriciously when it dismissed Ms. Runions, we will review each of the four causes of dismissal separately.

---

[5]      School officials apparently believed Ms. White's claim that she was so disturbed by Ms. Runions' alleged breaches of testing procedures that she was incapacitated by what she had witnessed, and perhaps it is for this reason that she was not terminated or otherwise punished for her own breach of the testing procedures. Interestingly, Ms. White's incapacitating condition seems to have been short-lived; evidence brought forth at the termination hearing showed that Ms. White remained at school for the rest of the day. At the very least, it reflects an unusually ardent commitment to the proper observance of test protocol that merely witnessing the infractions she alleged against Ms. Runions could have rendered Ms. White so violently ill.

[6]      Since we agree with the chancery court's determination that there is no material evidence that Ms. Runions breached the Test Security Policy, we do not reach the question of whether it was appropriate to terminate Ms. Runions for violating a Test Security Policy that, through no fault of her own, she had not had the opportunity to read and sign before she administered the TCAP. We do note, however, that the school board's action to terminate Ms. Runions under such circumstances appears to render superfluous the practice of requiring teachers to sign the policy.

### 1. Incompetence.

The Tennessee Tenured Teacher Act defines incompetence as follows:
"Incompetence" means being incapable, lacking adequate power, capacity or ability to carry out the duties and responsibilities of the position. This may apply to physical, mental, educational, or emotional or other personal conditions. It may include lack of training or experience; evidence unfitness for service; physical, mental, or emotional condition making teacher unfit to instruct or associate with children; or inability to command respect from subordinates or to secure cooperation of those with whom the teacher must work ...."

It is clear, from the facts brought forth at the termination hearing, and reviewed in Section II *supra*, that Ms. Runions was capable of performing the duties and responsibilities of her position. Her performance evaluations were outstanding, and even the testimony of the school officials who were seeking her termination indicated that she was a successful and effective teacher. No evidence adduced in the termination hearing indicated that Ms. Runions was unable to perform the duties and responsibilities of her position. Therefore, the claim that Ms. Runions was incompetent is without merit.

### 2. Inefficiency.

The Tennessee Tenured Teacher Act defines inefficiency as follows:

"Inefficiency" means being below the standards of efficiency maintained by others currently employed by the board for similar work, or habitually tardy, inaccurate, or wanting in effective performance of duties.

The evidence brought forth at Ms. Runions' termination hearing did not indicate that she fell below the standards of efficiency maintained by others currently employed by the school district who were doing similar work. Nor did the evidence indicate that Ms. Runions was "habitually tardy, inaccurate, or wanting in effective performance" of her duties. By all accounts, she was a highly praised, effective, and valued teacher. For this reason, we conclude that the charge of inefficiency is without merit.

### 3. Insubordination.

The Tennessee Teachers' Tenure Act defines insubordination, in relevant part, as follows:

(A) Refusal or continued failure to obey the school laws of Tennessee, or to comply with the rules and regulations of the board, or to carry out specific assignments made by the board, the director of schools or the principal, each acting within its own

-10-

jurisdiction, when such rules, regulations and assignments are reasonable and not discriminatory;

(B) Failure to participate in an in-service training program as set up by the local board of education and approved by the state board of education ....

If there were any merit to the allegations that Ms. Runions violated T.C.A. § 49-1-607, such a violation might constitute insubordination as defined here. However, as we concluded in in our analysis in section V, part A of this opinion, *supra*, there was no merit to the charge that Ms. Runions violated T.C.A. § 49-1-607. Therefore, such violation cannot form a basis for charging Ms. Runions with insubordination. Nor was any other evidence adduced at the termination hearing that supported a charge of insubordination. Therefore, the charge of insubordination is without merit.

### 4. Neglect of duty.

The Tennessee Teachers' Tenure Act defines "neglect of duty" in relevant part, as follows:

"Neglect of duty" means gross or repeated failure to perform duties and responsibilities which reasonably can be expected of one in such capacity, or continued unexcused or unnecessary absence from duty.

Aside from the meritless allegations that she had violated T.C.A. § 49-1-607, no evidence was brought forth at Ms. Runions' termination hearing that she had engaged in gross or repeated failure to perform the responsibilities of her position. In fact, aside from the allegations concerning her administration of the TCAP test, all evidence indicated that she had performed her duties and responsibilities admirably. For this reason, we conclude that there is no basis for charging Ms. Runions with neglect of duty.

Having reviewed the four bases for terminating Ms. Runions under the Tennessee Teachers' Tenure Act, we conclude that they are without merit. We further note that the comments made by Gary Emison, chair of the school board, when delivering the decision of the board, are revealing as to the arbitrary and capricious nature of the board's decision. Mr. Emison stated as follows:

I think, myself, personally speaking, that because of the evidence presented and seeing that there probably is and possibly even may be in the future a lot of hard feelings between Ms. Runions and our school administrators, that I feel that Ms. Runions' tenure as a teacher at Bells Elementary has come to an end.

The Tennessee Teachers' Tenure Act guarantees establishes a right to a school board hearing of the dismissal or termination of a teacher under permanent or limited tenure, and further guarantees subsequent judicial review by the chancery court of any school board decision dismissing a teacher. It is perhaps inevitable that, after a court challenge to a decision dismissing a teacher, there would be "hard feelings" between the teacher and the administrators who sought to dismiss him or her. For

the school board to base its decision to terminate Ms. Runions, even partly, on the possibility of hard feelings between herself and her school administrators, is emblematic of the arbitrary and capricious nature of the proceeding to terminate Ms. Runions. If such reasoning were accepted as a legitimate rationale for terminating a teacher, it would eviscerate the guarantee of due process by giving school boards *carte blanche* to terminate teachers at will, even in the absence of any substantial basis for such termination.

For all the foregoing reasons, we conclude, as did the chancery court, that the Bells School Board's decision to terminate Ms. Runions under T.C.A. § 49-5-501 *et seq.* was arbitrary, capricious, and without legal basis.

## VI. CONCLUSION

Accordingly, we affirm the judgment of the chancery court. Costs of this appeal are assessed to the Appellants, Bill Emerson, Director of Schools for Bells City Schools, and the Board of Education, Gary Emison, Charlotte Gaines, Mike Simmons, Eddie Spegal, and Dennis Wear, and their sureties.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.